FORTEE PROPERTIES, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33973. Promulgated October 28, 1952.

*Irwin D. Shapiro, Esq.*, for the petitioner.
*Robert J. McDonough, Esq.*, for the respondent.

#### OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $7,242.50 in the income tax of the petitioner for its fiscal year ended May 31, 1948. The stipulated facts and two exhibits are adopted as the findings of fact. The only issue for decision is whether the petitioner has failed to comply with the provisions of section 112 (f) so that $28,970 of its gain from the involuntary conversion of its property must be recognized. Section 112 (f) provides that if property, as a result of an exercise of the power of condemnation, is involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the establishment of a replacement fund, no gain shall be recognized, but if any part of the money is not so expended, the gain shall be recognized to the extent of the money which is not so expended.

The petitioner is a New York corporation which filed its return for the taxable year with the collector of internal revenue for the third district of New York.

The petitioner purchased two adjoining pieces of real property in New York City on June 5, 1942. The properties were then subject to two past due mortgages, one on each property in the amount of $18,000, which had been placed on the properties in 1910 by a prior owner. Central Savings Bank, mortgagee, held the two mortgages. The petitioner paid $4,000 in cash for the properties and took them subject to the mortgages but never assumed payment of or legal liability for the principal debt or interest covered by the mortgages. The petitioner also paid an additional amount of $397.01 in acquiring the properties.

"Depreciation on the buildings on said land to August 14, 1947 aggregated $2,116.63."

The Port of New York Authority took the two properties for public use on August 14, 1947, under its power of eminent domain by condemnation proceedings. Thereafter, the petitioner and the Port of New York Authority agreed that the total value of the properties on August 14, 1947, was $74,000. The amount then due on the two mortgages was $28,970. The final decree of the Court in the condemnation proceeding approved, in connection with the two properties here in question, the award of $74,000 as set forth as follows in "the tabular abstract of awards" annexed to the decree:

| Damage parcel Nos. | Owners | Estimated loss or damage | Final awards |
|---|---|---|---|
| * * * | * * * | * * * | * * * |
| 31 | UNENCUMBERED FEE_____ Fee owner: The Port of New York Authority as assignee of Fortee Properties, Inc. Mortgagee: The Port of New York Authority as assignee of Central Savings Bank in the City of New York; proved claim for separate award in the amount of $14,748.08. Mortgagee: The Port of New York Authority, as assignee of Central Savings Bank in the City of New York; proved claim for separate award in the amount of $14,748.08. | $74,000 AA | $74,000 AA |

The Port of New York Authority paid to the petitioner $45,030 in cash on December 17, 1947. The Port of New York Authority paid $28,970 to the Central Savings Bank in satisfaction of the mortgages. The petitioner had no control over the payment or disposition of the $28,970.

The cost to the petitioner of the disposition of the property was $933.33.

The petitioner applied to the Commissioner of Internal Revenue about March 1948 for and the Commissioner on June 21, 1948, granted permission to establish a replacement fund for the net amount of $44,096.67 received by the petitioner as a result of the involuntary taking of its two properties. The petitioner filed a bond approved by the Commissioner in connection with the replacement fund.

The petitioner, in 1949, reinvested the entire Replacement Fund in two other properties. Its total investment in one was $12,418.76 and it took that property subject to a mortgage of $48,000. Its total investment in the other was $33,904 and it took that property subject to a mortgage of $118,650. It thus invested in the two properties $2,226.09 in excess of the replacement fund.

The Commissioner, in determining the deficiency for the fiscal year ended May 31, 1948, added to the income reported $28,970, described as "Gain on involuntary conversion," and explained that the long term gain realized on the involuntary conversion of the two properties is taxable in the amount of $28,970.

The petitioner does not deny that it realized a gain of at least $28,970. Its actual gain, determined under section 111, was, apparently, $34,786.29. The Commissioner does not question that there was an involuntary conversion and a "forthwith" expenditure of the $44,-096.67 for similar property pursuant to the regulations. His only reason for recognizing $28,970 of the gain is that the $28,970 was paid to the mortgagee in connection with the condemnation and was not expended by the petitioner for the acquisition of similar property within the meaning of section 112 (f).

The question is whether the petitioner has failed to comply with section 112 (f) by not investing in his new properties the $28,970 paid under a separate award to the mortgagee of the mortgages on his condemned properties for which debt he was not personally liable. The sensible and just answer to that question seems clear—he has complied in every way that Congress intended. His property was condemned and involuntarily converted into money in the amount of $44,096.67, an approved replacement fund was established with that money, and all of the money, and more, was invested in property similar to that taken in the condemnation.

However, the problem can become far more complex if other more difficult questions, which, conceivably, can have some relation to it must be considered along with it and completely reconciled. The Commissioner's position is a narrow technical one which would produce an unnecessarily harsh result. He could make an even better argument in regard to $933.33 of the actual award to the petitioner, which was used to pay expenses incident to the conversion, but he apparently avoids that position as one not intended by Congress.

Regulations 111, section 29.112 (f) (1) provides that "If, in a condemnation proceeding, the Government retains out of the award sufficient funds to satisfy * * * mortgages against the property and itself pays the same, the amount so retained shall not be deducted from the gross award in determining the amount of the net award," and in the next subparagraph of the same regulation it is provided that a taxpayer who is prevented from replacing his property immediately "may obtain permission to establish a replacement fund in his accounts in which part or all of the compensation so received shall be held, without deduction for the payment of any mortgage." The Commissioner quotes and relies upon those provisions of his regulations as authority for recognizing the gain of this petitioner to the extent of $28,970 which the Port of New York Authority used by a separate award to satisfy the two mortgages on the property for which the petitioner was not personally liable. The Commissioner argues that the $28,970 was a part of the $74,000 award to the petitioner, but the record shows that the $28,970 was a separate award. If his regulation is intended to cover a case like this one in which the petitioner was not personally

liable for the mortgages, then to that extent the regulation is invalid because it frustrates rather than promotes the intention of Congress.

The Commissioner cites *Crane* v. *Commissioner*, 331 U. S. 1, for the proposition "that where property is purchased, and the purchaser takes subject to a mortgage, the amount of the mortgage is includible in the purchase price." The case is not authority for any such proposition since it did not involve that question. The taxpayer there had acquired title to improved mortgaged real estate by devise from her husband. She did not become liable for the mortgage. The value of the property at his death did not exceed the mortgage debt then due. The Court held that the widow's basis for the property under section 113 (a) (5) was its fair market value when her husband died. That question and that provision of the law are not involved herein. Some views on basis were expressed in the case of *Blackstone Theatre Co.*, 12 T. C. 801, and the *Crane* case was cited as authority. However, the question in that case was whether the taxpayer's basis for property subject to tax liens when acquired was the cash paid plus the face amount of the liens or plus only the much smaller amount later paid to discharge those liens. No similar question is here present and that case is not in point. The Board of Tax Appeals had held in a number of cases that the basis of a purchaser, who takes subject to a mortgage and does not become personally liable for the mortgage debt, does not include the mortgage but would include any later payments made by him on the mortgage principal. *American Seating Co.*, 14 B. T. A. 328, reversed on another point 50 F. 2d 681; *Hotel Astoria, Inc.*, 42 B. T. A. 759, 762; *W. W. Hoffman*, 40 B. T. A. 459, affd. 117 F. 2d 987; *Realty Operators, Inc.*, 40 B. T. A. 1051, affirmed and appeal dismissed 118 F. 2d 286. Such a holding is necessary if depreciation deductions are to restore tax free no more than the actual cost of the depreciable property to the owner. *United States* v. *Ludey*, 274 U. S. 295. The Court further held in the *Crane* case that the "amount realized," when the widow sold her rights for $2,500 net, included the amount due on the mortgage despite the fact that she was not personally liable for the mortgage debt. The "basis" and the "amount realized" are important in computing gain under section 111 but neither is mentioned in section 112 (f). The amount of the gain and the basis for the replacement property are not in dispute in the present case, in which the only question is whether all of the "money" into which the condemned property was converted was invested in the replacement property. The *Crane* case did not involve section 112 (f) and there is no sufficient reason for it to control the decision in the present case.

The Commissioner cites several cases in which money awarded on an involuntary conversion was used by the Government to pay a lien

placed upon the property during the time that it was owned by the taxpayer or a debt for which the taxpayer was personally liable. Those cases are distinguishable since none involved a taxpayer who was not personally liable for the mortgage debt satisfied in the condemnation. It is one thing to hold, as some of those cases have, that such a taxpayer-owner receives "money" directly, indirectly, or constructively, from the conversion where other money which he had borrowed for his own purposes is repaid as a direct result of the conversion or a lien which arose during his ownership is discharged to his advantage as a direct result of the conversion. Cf. *Washington Market Co.*, 25 B. T. A. 576. But the situation in the present case is quite different for here the petitioner did not borrow the money or benefit in any way from the mortgages placed on the property years before it acquired the property. The petitioner never became obligated to pay the mortgages and the benefit which the petitioner received through the foreclosure was not increased or affected in any way by the fact that the Port of New York Authority paid off those old mortgages by a separate award in connection with the condemnation proceeding. Cf. *Fulton Gold Corporation*, 31 B. T. A. 519; *Commonwealth, Inc.*, 36 B. T. A. 850; *James Lapsley*, 44 B. T. A. 1105; *P. J. Hiatt*, 35 B. T. A. 292.

The only amount which the Port of New York Authority paid to the petitioner or paid out for its benefit was the $45,030 paid to the petitioner. It invested all of that money, plus some additional money, in acquiring property similar in use and service to that taken in the condemnation. The rather clear intention of Congress would be defeated rather than carried out if a part of the petitioner's gain were to be recognized because it did not also expend in the acquisition of similar property the $28,970 which it did not have invested in the condemned property, for the payment of which it was not personally liable, and which it did not receive directly, indirectly, or constructively. The law did not require the petitioner to invest any more than $44,096.67 in the new property to avoid the recognition of gain on the condemnation proceeding. The situation of an owner who has borrowed money and thereby mortgaged his property is entirely different. Obviously, the latter could not avoid recognition of his gain by mortgaging his property just prior to the conversion or even long prior to the conversion, since the conversion pays off a debt of that taxpayer for money which he has previously borrowed for his own purposes and enjoyed. His debt is repaid and his credit restored. But the present petitioner never used his credit to borrow any money, never borrowed and used any money for his own benefit, is not relieved of the repayment of any debt, but, on the contrary, has invested in similar property every cent which he received directly, indirectly, or constructively

as a result of the conversion and has fully complied with the provision of section 112 (f).

Reviewed by the Court.

*Decision will be entered under Rule 50.*